[Civ. No. 50345. Second Dist., Div. Five. Aug. 31, 1977.]

PACIFIC SOUTHWEST AIRLINES, Plaintiff and Respondent, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

**COUNSEL**

Evelle J. Younger, Attorney General, Ernest P. Goodman, Assistant Attorney General, Philip C. Griffin and Rodney Lilyquist, Jr., Deputy Attorneys General, for Defendant and Appellant.

O'Melveny & Myers, Girard E. Boudreau, Jr., Donald R. Spuehler and Frederick A. Richman for Plaintiff and Respondent.

**OPINION**

**STEPHENS, Acting P. J.**—The evidence derives solely from a written stipulation of facts. Pacific Southwest Airlines (hereinafter, PSA) is

principally engaged in the business of operating aircraft as a common carrier in California. PSA also uses its passenger aircraft during off-peak periods to generate other flight revenue, primarily from the training of airline pilots for other common carriers. All of the instructors are PSA pilots who alternate between flying PSA's aircraft as common carriers, and utilizing them to instruct other pilots.

On March 23, 1967, PSA took delivery of the DC-9 which is the subject of this case, and provided the seller, Douglas Aircraft Co., Inc. with a certificate stating that the aircraft would be used as a common carrier of persons or property under section 6366 of the Revenue and Taxation Code.[1] Douglas was accordingly entitled to exempt the gross receipts from the sale of the aircraft from the computation of its sales tax liability, and not required to collect sales tax reimbursement from PSA.

During the first six months after delivery, PSA used the aircraft in the following manner: (1) 1,150 air hours (63.23 percent) to train pilots employed by other unrelated common carriers; (2) 548 air hours (30.14 percent) to transport passengers as a common carrier; and (3) 120 air hours (6.60 percent) to train PSA's own pilots. From the time of delivery in March 1967 until January 21, 1970 when it was sold, PSA used the aircraft in the following manner: (1) 4,078 air hours (67.12 percent) to transport passengers as a common carrier;(2) 1,704 air hours (28.04 percent) to train pilots employed by other unrelated common carriers; and (3) 294 air hours (4.84 percent) to train PSA's own pilots.

In 1971 the Board of Equalization audited the books and records of PSA for the period April 1, 1967, through June 30, 1970. During the audit, the board for the first time administratively interpreted section 6366 as exempting from the sales tax only those aircraft "principally" (more than 50 percent) used as a common carrier during a test period of the first six months after delivery. The board's interpretation was embodied in a Sales Tax Counsel Ruling[2] issued July 8, 1971, and provided the

---

[1] Revenue and Taxation Code section 6366 provides: "There are exempted from the taxes imposed by this part the gross receipts from the sale of and the storage, use, or other consumption of aircraft sold to persons using such aircraft as common carriers of persons or property under authority of the laws of this state, of the United States or any foreign government, or sold to any foreign government for use by such government outside of this state, or sold to persons who are not residents of this state and who will not use such aircraft in this state otherwise than in the removal of such aircraft from this state."

[2] The ruling was published in the California Tax Service as Annotation 105.0210.

basis for the board's finding that the aircraft in question was subject to tax under section 6421.[3]

After disputing the assessment at administrative hearings, PSA paid $191,111.27 in sales tax and interest relating to the aircraft, whereupon the present action was initiated by PSA to recover the tax from the board. Having found that PSA qualified for the exemption granted by section 6366, the trial court ordered that the entire sum be refunded to PSA pursuant to Revenue and Taxation Code section 6936, and the board appeals.

## Discussion

The threshold problem involves the scope of judicial review of the board's assessment and its underlying "six-month principal use" test. Had the board promulgated a formal regulation or interpretive ruling (see Rev. & Tax. Code, § 7051 and Gov. Code, § 11420 et seq.), our inquiry would be necessarily confined to the question of whether the administrative classification was arbitrary, capricious, or without rational basis. (*Culligan Water Conditioning* v. *State Bd. of Equalization,* 17 Cal.3d 86, 92 [130 Cal.Rptr. 321, 550 P.2d 593].) ▮ Because none of these required notice-providing procedures was followed, the board's six-month test is invalid as an administrative regulation (*California Medical Assn.* v. *Brian,* 30 Cal.App.3d 637, 655 [106 Cal.Rptr. 555].) However, even assigning "great weight" to the board's interpretations (see *Culligan, supra,* pp. 92-93) and noting that tax exemptions are to be strictly construed against the taxpayer (*Santa Fe Transp.* v. *State Board of Equal.,* 51 Cal.2d 531, 539 [334 P.2d 907]), we must hold that the board has not properly interpreted the relevant sections of the Sales and Use Tax Law or its own regulations. Our decision is based upon the mutuality of lack of notice to the taxpayer and insurmountable obstacles of statutory construction.

Support for the board's theory that PSA had or should have had notice of the six-month use test is nonexistent. Not only are section 6366 and its

---

[3] Revenue and Taxation Code section 6421 provides: "If a purchaser certifies in writing to a seller that the property purchased will be used in a manner or for a purpose entitling the seller to regard the gross receipts from the sale as exempted by this chapter from the computation of the amount of the sales tax, and uses the property in some other manner or for some other purpose, the purchaser shall be liable for payment of sales tax as if he were a retailer making a retail sale of the property at the time of such use, and the cost of the property to him shall be deemed the gross receipts from such retail sale."

corollary, California Administrative Code, title 18, section 1593, completely silent on the matter, but the latter regulation (subd. (g)) qualifies its silence with the admonition that "[n]o inference either adverse or favorable shall be drawn from this ruling as to liability for the tax with respect to aircraft in any situation not specifically considered herein." On the other hand, appellant's argument (that § 6421's broad disallowance of exemptions if the "purchaser . . . in some other manner or for some other purpose" contrary to what he has certified to the seller was sufficient to put PSA on notice of the six-month principal-use test) lacks cogency for the reason that, unlike other code sections (see Rev. & Tax. Code, §§ 202, subd. (c), 206.1), 6366 does not require exclusive use. Even the board concedes the point by postulating that exempt use must be merely over 50 percent.

As the trial court recognized, the fact that other exemption statutes, cases interpreting them, or administrative regulations approve of a six-month use test would reasonably indicate to the taxpayer that the Legislature and the board did not intend to implement that test in construing section 6366. This becomes especially apparent when one considers that previous application of a six-month principal use test has been limited to the different context of use tax under section 6201, whose requirement that subject property must be purchased for use in California necessitates inquiry into the taxpayer's intent and hence an examination of his first six months of ownership. (See *Union Oil Co.* v. *State Bd. of Equal.*, 60 Cal.2d 441 [34 Cal.Rptr. 872, 386 P.2d 496] and *Western Pac. R.R. Co.* v. *State Bd. of Equalization*, 213 Cal.App.2d 20 [28 Cal.Rptr. 453].) By contrast, a sales tax exemption like that found in section 6366 "plainly makes use of the property the basis of the exemption," the taxpayer's intentions being "wholly immaterial." (*Cedars of Lebanon Hosp.* v. *County of L.A.*, 35 Cal.2d 729, 743 [221 P.2d 31, 15 A.L.R.2d 1045].)

Thus, since PSA could not have foreseen the board's present posture, they were under no duty to request the customary Sales Tax Counsel Ruling from the board. Moreover, because PSA acquired actual notice of the six-month test long after the operative events of the aircraft's use, the board's contention of prior notice is not only rendered frivolous, but is inconsistent with the principles of due process which the Legislature enacted in section 11420 of the Administrative Procedure Act. Having reasonably relied upon the plain meaning of section 6366 (See Code Civ. Proc., § 1858), PSA is entitled to the exemption and a full refund of the sales tax and interest paid on the aircraft in controversy, since the

total of 71.96 percent of use devoted to transportation of passengers as a common carrier and the necessary incident of training pilots for that purpose, over a nearly three-year period of ownership, comes well within the bona fide use contemplated by the statute.

■ Although lack of notice and authority render the board's position erroneous, we note that the administrative necessity for the six-month principal use test urged by the board is not indicated by the facts. All of the information regarding PSA's use of the aircraft was at the board's disposal since the aircraft had been sold a year prior to the audit. Too, there was no evidence that examination of nearly three years of use would have unduly burdened the board. Citation to hypothetical difficulties such as reviewing flight logs for 10-year periods, a 10-year delay in collecting sales tax, and problems relating to the 3-year statute of limitations for assessing taxes (see § 6487) are of no moment in determining whether the facts of this case justify the exemption. (See *Ferrante* v. *Fish & Game Commission,* 29 Cal.2d 365, 373 [175 P.2d 222].)

In addition, the focus of section 6366 on how the aircraft is used during its ownership would be distorted by imposition of a six-month use test since, following the board's logic, PSA would have qualified for the exemption had they principally or exclusively used the aircraft as a common carrier during the first six months of ownership—solely to obtain favorable tax treatment—and then deployed the aircraft to other purposes for future years of ownership. The board's position thus would encourage other than bona fide use as a common carrier, a consequence absent in the facts before us and, by inference, in the Legislature's intent.

The judgment is affirmed. Costs to respondent.

Ashby, J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 3, 1977.