[No. F025641. Fifth Dist. Aug. 26, 1996.]

AGRICULTURAL LABOR RELATIONS BOARD, Petitioner, v.
THE SUPERIOR COURT OF STANISLAUS COUNTY, Respondent;
GALLO VINEYARDS, INC., et al., Real Parties in Interest.

COUNSEL

J. Antonio Barbosa, Joseph P. Wender, Jr., and Julie Demaris for Petitioner.

No appearance for Respondent.

Marcos Camacho, Thomas Patrick Lynch, Morgan, Lewis & Bockius, Joseph E. Herman, Michael C. Lieb, Keith D. Grossman, Damrell, Nelson, Schrimp, Pallios & Ladine and Roger M. Schrimp for Real Parties in Interest.

OPINION

THAXTER, J.—Petitioner Agricultural Labor Relations Board (ALRB or Board) seeks a writ of mandate directing respondent superior court to vacate an order which, in effect, voids the certification of real party in interest United Farm Workers of America, AFL-CIO (UFW) as the exclusive collective bargaining representative of all agricultural employees of real party in interest Gallo Vineyards, Inc. (Gallo) in Sonoma County and the election upon which the certification was based.

The narrow issue presented is whether respondent court's order was within its jurisdiction. We will conclude it was not and will grant the requested relief.

FACTUAL AND PROCEDURAL BACKGROUND

*The Certification Petition and Election*

Gallo raises varietal wine grapes on five ranches in Sonoma County. On July 18, 1994, the UFW filed a petition with ALRB pursuant to Labor Code section 1156.3[1] for certification of the UFW as exclusive bargaining representative of Gallo's Sonoma County agricultural employees. Two days later, Gallo requested the ALRB to dismiss the petition because its then current work force was less than 50 percent of the anticipated peak employment for the calendar year 1994, which Gallo predicted would occur during the first or second week of September. Gallo also filed an "Employer's Response" form estimating a need for 250 or more employees during the 1994 peak

[1]Unless otherwise indicated, all statutory references are to the Labor Code.

season grape harvest. Gallo asserted the 1994 harvest would require more workers than those employed in 1993 because additional acreage was to be harvested and a higher yield was expected. One item on the form stated, "If the employer contends that the payroll period of peak employment in the calendar year will occur later in the calendar year, ATTACH payroll records from prior years, crop and acreage information, and any other information which supports that contention." Gallo replied, "Same crop and probably more acreage bearing fruit in 1994."

Gallo wrote another letter to the ALRB on July 21, 1994, again contending the current employment complement was less than the 50 percent of anticipated peak employment required under section 1156.3, subdivision (a)(1). The following day Gallo sent the ALRB yet a third letter stating 174 acres would be harvested for the first time in 1994 and an additional 205 acres would be reaching second harvest, increasing total yield. This, Gallo claimed, would require additional employees.

Following investigation, the ALRB determined that the UFW's petition presented "reasonable cause to believe that a bona fide question of representation exists," and, pursuant to section 1156.3, subdivision (a), conducted an election on July 26, 1994. There were 114 eligible employees, of whom 107 voted; of those, 81 voted for the UFW, 21 voted "No union," and there were 5 unresolved challenged ballots. Based on the election results, the UFW was tentatively certified as the official bargaining representative of the Gallo employees.

*ALRB Review*

Pursuant to section 1156.3, subdivision (c), Gallo objected to the election on August 2, 1994. The sole ground of objection was that the ALRB "failed to investigate, completely ignored evidence to the contrary, and otherwise improperly directed an election at a time when [Gallo] was employing less than 50% of its peak agricultural employment compliment [*sic*] for the 1994 calendar year." The ALRB ordered its regional director to provide, by declaration of appropriate personnel, an explanation of the manner in which the determination was made that Gallo was at 50 percent or more of peak employment.

Octavio Galarza, the field examiner of the ALRB's Salinas regional office, responded with a declaration that he reviewed Gallo's payroll records for the prepetition payroll period ending July 17, 1994, and, using the "body

count" method under *Triple E Produce Corp.* (Oct. 10, 1990) 16 ALRB No. 14, found a total of 110 employees. He then reviewed the payroll register for the previous peak employment period ending September 12, 1993, and found a total of 257 employees. Because the current body count was less than 50 percent of the prior peak body count, he then estimated the average employee days for the prior peak period. The daily employee count for the week ending September 12, 1993, was 283, 185, 189, 168, 151 and 74 for a 6-day work week, yielding an average number of 175 employees per day. The current employment force of 110 exceeded 50 percent of the average force in the preceding peak employment period.

Galarza's declaration continued:

"Next, I took under consideration of prospective peak based upon the employer's expected increase in harvest yield and additional acreage, and therefore a projected future increase in production for 1994. I interviewed an employee of the company who has worked for Gallo year-round since 1989, including the 1993 harvest. He worked in all of the company's current acreage and is familiar with the new additional acreage that the employer contends will require additional employees in the harvest. This employee stated that the same number of crews hired for the harvest in September 1993 will be sufficient to harvest the prospective harvest in 1994. . . .

"On July 22, 1994, [Gallo], through its counsel Jordan Bloom, transmitted to me by facsimile a letter stating that additional employees would be needed to perform harvest work although it was not possible for the company to estimate how many such workers would be needed. . . .

"Based upon the available information furnished by [Gallo] and my interview with the above-mentioned employee, I made a determination that [Gallo] was at more than fifty percent of peak at the time of the pre-petition payroll period."

On August 30, 1994, the ALRB's executive secretary dismissed Gallo's objection to the election because the objection and its supporting documents failed to make a prima facie showing that the regional director's finding of peak employment was unreasonable. As a further ground for dismissal, the executive secretary stated Gallo's contention that the ALRB should have averaged the eligibility period figures as well as those of the prior peak employment period is contrary to applicable law, citing *Adamek & Dessert, Inc.* v. *Agricultural Labor Relations Bd.* (1986) 178 Cal.App.3d 970 [224 Cal.Rptr. 366]. Finally, the objection was dismissed because Gallo's contention that prospective peak figures should not be averaged unless there is a

high turnover is contrary to ALRB law, citing *Triple E Produce Corp.*, *supra*, 16 ALRB No. 14.

Pursuant to title 8, California Code of Regulations, section 20393, subdivision (a), Gallo requested the ALRB review of the executive secretary's dismissal of its election objection. The Board granted the request and set a hearing before an investigative hearing examiner (IHE). The hearing was held on November 9, 1994. Gallo submitted additional evidence showing the actual peak employment numbers during harvest in September 1994. Based on those figures, the eligible employees at the time of the certification petition were not 50 percent of peak employment.

The IHE issued a decision on January 12, 1995. He concluded that the regional director's office acted reasonably in determining that the 50 percent of peak employment requirement was met, and he recommended that the Board dismiss Gallo's objection and certify the election results.

In February 1995, Gallo filed exceptions to the decision of the IHE, arguing, inter alia, that the ALRB violated section 1156.4 by not applying a uniform statewide standard to the crop and acreage information supplied by Gallo.

On July 26, 1995, the Board issued a decision affirming the dismissal of the election objection and certifying the UFW as representing Gallo's employees. (*Gallo Vineyards, Inc.* (July 26, 1995) 21 ALRB No. 3.) The ALRB affirmed the IHE's decision. It also rejected Gallo's new argument based on the provisions of section 1156.4.

In July 1995 following certification, the UFW requested negotiations with Gallo. Gallo acknowledged the request in August 1995 but stated it was unable to comply because of its intention "to obtain resolution of this matter in the courts." On August 31, 1995, the UFW filed a charge against Gallo for engaging in unfair labor practices.

*Judicial review*

On September 11, 1995, before resolution of the unfair labor practices charge, Gallo filed a petition for writ of mandate with respondent court seeking a stay and relief directed at overturning the ALRB decision. Gallo claimed the ALRB exceeded its jurisdiction in not dismissing the UFW certification petition, violated express provisions of the Agricultural Labor

Relations Act (Act)[2] and the Administrative Procedure Act (APA),[3] and denied Gallo due process of law. Noting the Act does not allow for direct judicial review of routine election certification decisions, Gallo urged that its petition came within judicially recognized exceptions to the routine procedure.

Respondent court issued an alternative writ of mandate and order to show cause and stayed the UFW's certification pending hearing. The court held a hearing on the order to show cause on October 26, 1995, and issued a minute order four days later denying Gallo's petition for lack of jurisdiction, dissolving the stay, and directing the ALRB's counsel to prepare a formal order. The ALRB submitted a proposed formal order consistent with the minute order. Gallo objected to the proposed order denying the writ, and respondent court held a hearing on the objections on December 21, 1995. At that hearing respondent court requested further briefing on the issues. All parties submitted supplemental briefs.

On March 4, 1996, respondent court issued an order on reconsideration which granted Gallo's petition for writ of mandate. The court found it had jurisdiction to review the ALRB's certification of the UFW under an exception recognized in *Leedom* v. *Kyne* (1958) 358 U.S. 184 [3 L.Ed.2d 210, 79 S.Ct. 180] because the ALRB "has clearly violated" section 1156.4. The court further found that the ALRB deprived Gallo of due process, that exhaustion of administrative remedies would be futile, and Gallo would suffer irreparable harm if relief was not granted. Respondent directed Gallo to prepare a statement of decision.

On March 18, 1996, the ALRB filed this writ proceeding seeking, among other things, an order commanding respondent court to vacate its order of March 4, 1996, and any subsequent decision based thereon and entry of a new order denying Gallo's writ petition below. We issued an order to show cause. We did not, however, prohibit respondent from entering its statement of decision which was subsequently signed and filed on April 18, 1996.

### DISCUSSION

The threshold question posed by the ALRB's petition here is whether respondent court acted within its jurisdiction in taking action aimed at invalidating UFW's certification.

---

[2]Section 1140 et seq.
[3]Government Code section 11340 et seq.

## 1. *General Rule of No Direct Judicial Review Under the Act*

The Act, enacted in 1975, is modeled largely after the comprehensive federal labor relations statutes, the National Labor Relations Act, and the Taft-Hartley Act (NLRA). The Act established the ALRB, which possesses authority and responsibilities comparable to those exercised by the National Labor Relations Board (NLRB), as the agency in charge of the Act's implementation and administration.

In accordance with the policies expressed in the NLRA (29 U.S.C. § 151), the Act declares, inter alia, "It is hereby stated to be the policy of the State of California to encourage and protect the right of agricultural employees to full freedom of association, self-organization, and designation of representatives of their own choosing . . . for the purpose of collective bargaining or other mutual aid or protection." (§ 1140.2.) A central feature in the promotion of this policy is the Act's procedure for agricultural employees to elect representatives "for the purpose of collective bargaining with respect to rates of pay, wages, hours of employment, or other conditions of employment." (§ 1156 et seq.; *J.R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 8 [160 Cal.Rptr. 710, 603 P.2d 1306].)

■ Because the seasonal nature of agricultural employment differs from that in an industrial setting, the Act requires that elections be held only when the current work force is at least 50 percent of the employer's "peak" agricultural employment during the current calendar year. (§§ 1156.3, subd. (a)(1), 1156.4.) This requirement "is designed to insure seasonal workers' [*sic*] that representational rights are not determined for them, during the 'off-season,' by a year-around worker minority." (*Ruline Nursery Co.* v. *Agricultural Labor Relations Bd.* (1985) 169 Cal.App.3d 247, 256 [216 Cal.Rptr. 162].) Since the peak is to be determined for the current calendar year, the ALRB may need to look backward, if peak employment has already occurred (past peak), or forward by estimating the expected peak employment (prospective peak), depending upon when the certification petition is filed. (*Id.* at p. 257, fn. 6.) All parties agree this is a prospective peak case.

■ Under the NLRA, orders in certification proceedings are not directly reviewable in the courts but only become reviewable through section 9, subdivision (d) (29 U.S.C. § 159(d)) and section 10, subdivision (e) (29 U.S.C. § 160(e)) of the NLRA, whereby an employer may, by resistance to an unfair labor charge, obtain review of some issues which may be involved in the certification. (*A.F. of L.* v. *Labor Board* (1940) 308 U.S. 401 [84 L.Ed. 347, 60 S.Ct. 300]; *Boire* v. *Greyhound Corp.* (1964) 376 U.S. 473 [11

L.Ed.2d 849, 84 S.Ct. 894].) Likewise, the Act does not afford an employer the right to obtain judicial review of a certification order. In *Nishikawa Farms, Inc.* v. *Mahony* (1977) 66 Cal.App.3d 781 [136 Cal.Rptr. 233] the court applied the federal concept to cases arising under the Act, stating, "When legislation has been applied in judicial decisions and then a subsequent statute on an analogous subject employs identical language, it is to be presumed that the Legislature intended that the language be given a like interpretation in applying the new enactment. 'This rule is applicable to state statutes which are patterned after federal statutes.' [Citations.] In light of the foregoing principle, we conclude that a certification order under section 1156.3 of the [Act] is not a 'final order' of the board; therefore, it is not normally subject to judicial review except as it may be drawn in question by a petition for review of an order made under section 1160.3 of the act restraining an unfair labor practice. (See also Lab. Code, § 1158.)" (*Id.* at pp. 787-788; accord, *George Arakelian Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1989) 49 Cal.3d 1279, 1286, fn. 1 [265 Cal.Rptr. 162, 783 P.2d 749]; *J.R. Norton Co.* v. *Agricultural Labor Relations Bd.*, *supra*, 26 Cal.3d at pp. 10-11.) When the Board has made a final order on the unfair labor practice complaint, the order is reviewable in the Court of Appeal, not the superior court. (§ 1160.8.) Similarly, under federal law such orders of the NLRB are reviewable in the circuit courts of appeals, not the district courts. (29 U.S.C. § 160(f).)

## 2. The Leedom v. Kyne Exception; Genesis and Development of the Exception

In some cases, however, federal district court review of orders in certification proceedings has been permitted before an unfair labor practice complaint has been heard. The leading case establishing an exception to the normal procedure is *Leedom* v. *Kyne*, *supra*, 358 U.S. 184. In that case the NLRB, without polling the professional employees, approved as appropriate a unit containing both professional and nonprofessional employees. This was in direct contravention of section 9(b)(1) of the NLRA (29 U.S.C. § 159(b)(1)) which stated, "the Board shall not (1) decide that any unit is appropriate . . . if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit." The NLRB did not contest that it had acted in excess of its powers and denied the professional employees their statutory rights, contending only that the district court lacked jurisdiction to entertain their suit. (*Leedom* v. *Kyne*, *supra*, at p. 187 [3 L.Ed.2d at pp. 213-214].) In finding jurisdiction, the Supreme Court said: "This suit is not one to 'review,' in the sense of that term as used in the

[NLRA], a decision of the [NLRB] made within its jurisdiction. Rather it is one to strike down an order of the [NLRB] made in excess of its delegated powers and contrary to a specific prohibition in the [NLRA]." (*Id.* at p. 188 [3 L.Ed.2d at p. 214].)

The court further emphasized the NLRB's action, in attempting to exercise a power that had been specifically withheld, "deprived the professional employees of a 'right' assured to them by Congress." (*Leedom* v. *Kyne*, *supra*, 358 U.S. at p. 189 [3 L.Ed.2d at p. 214].) Finally, the court noted that the professional employees lacked any other means to protect and enforce their statutory right, supporting an inference that Congress did not intend to deprive the district courts of jurisdiction. (*Id.* at pp. 190-191 [3 L.Ed.2d at pp. 215-216].)

The Supreme Court reexamined the *Leedom* v. *Kyne* exception in *Boire* v. *Greyhound Corp.*, *supra*, 376 U.S. 473. In *Boire* the NLRB ordered a representational election after concluding Greyhound Corporation was a joint employer of porters, janitors and maids on the payroll of an independent contractor but working at Greyhound terminals. Greyhound filed a district court suit in which it obtained orders enjoining the pending election. After the court of appeals affirmed, the Supreme Court granted certiorari. Reaffirming its prior holdings that normally orders in certification proceedings are not directly reviewable in the courts, the court said: "That this indirect method of obtaining judicial review imposes significant delays upon attempts to challenge the validity of [NLRB] orders in certification proceedings is obvious. But it is equally obvious that Congress explicitly intended to impose precisely such delays." (*Id.* at pp. 477-478 [11 L.Ed.2d at p. 853].)

The court reviewed applicable legislative history and then turned to two cases, including *Leedom* v. *Kyne*,[4] in which district court review of orders entered in certification proceedings was permitted. The court first noted that each of those cases was "characterized by extraordinary circumstances." (*Boire* v. *Greyhound Corp.*, *supra*, 376 U.S. at p. 479 [11 L.Ed.2d at p. 854].) The court then dealt with Greyhound's argument that because independent contractors are specifically excluded from the NLRA definition of "employee," the NLRB's finding, that Greyhound was a joint employer of the

---

[4]The other case referred to was *McCulloch* v. *Sociedad Nacional* (1963) 372 U.S. 10 [9 L.Ed.2d 547, 83 S.Ct. 671], which upheld district court jurisdiction in a case involving application of United States laws to foreign-flag ships and their crews on the grounds that "public questions particularly high in the scale of our national interest because of their international complexion is a uniquely compelling justification for prompt judicial resolution of the controversy over the [NLRB's] power." (*Id.* at p. 17 [9 L.Ed.2d at p. 552].) There is no claim that the present case falls within the *McCulloch* exception and we accordingly give it no further consideration.

workers hired, paid, transferred and promoted by an independent contractor exceeded the NLRB's statutory powers. The court rejected the argument, concluding: "The [*Leedom* v.] *Kyne* exception is a narrow one, not to be extended to permit plenary district court review of [NLRB] orders in certification proceedings whenever it can be said that an erroneous assessment of the particular facts before the [NLRB] has led it to a conclusion which does not comport with the law." (*Id.* at p. 481 [11 L.Ed.2d at p. 855].)

The California courts have likewise been loath to find exceptions to the rule precluding direct review of orders in certification proceedings. In *Nishikawa Farms, Inc.* v. *Mahony, supra,* 66 Cal.App.3d 781, the employer sought trial court writ relief to set aside a representation election, contending the court had jurisdiction because the ALRB acted in excess of its authority in scheduling, conducting, and certifying the election without a petition supported by a majority of the persons employed in the bargaining unit. The trial court rejected the request, and the First Appellate District affirmed. The court stated, ". . . the *Leedom* v. *Kyne* exception is a very limited one." (*Id.* at p. 789.) It also quoted from *McCulloch* v. *Libbey-Owens-Ford Glass Co.* (D.C. Cir. 1968) 403 F.2d 916, 917 [131 App.D.C. 190]: ". . . '[T]o say that there are possible infirmities in an action taken by the [NLRB] . . . is not to conclude that there is jurisdiction in the District Court to intervene by injunction. For such jurisdiction to exist, the [NLRB] must have stepped so plainly beyond the bounds of the [NLRA], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court . . . .' " (*Nishikawa Farms, Inc.* v. *Mahony, supra,* 66 Cal.App.3d at p. 790.)

This court likewise rejected attempts to come within the *Leedom* v. *Kyne* exception in two cases decided shortly after *Nishikawa.* In *Radovich* v. *Agricultural Labor Relations Bd.* (1977) 72 Cal.App.3d 36 [140 Cal.Rptr. 24], two employers contended the ALRB exceeded its powers by dismissing some objections to conduct allegedly affecting a representation election and by holding an election nine days after the election petition was filed, rather than within the "maximum of seven days" specified in section 1156.3, subdivision (a). Stressing the narrowness of the *Leedom* v. *Kyne* exception, this court concluded that neither of the situations before it fell within that exception. In doing so, we pointed out that under the statutory scheme the employers' remedy was to refuse to bargain with the union and contest the issues in a subsequent unfair labor practice proceeding. (72 Cal.App.3d at pp. 46-47.)

We followed suit in *United Farm Workers* v. *Superior Court* (1977) 72 Cal.App.3d 268 [140 Cal.Rptr. 87], which involved the question whether an

employer's duty to bargain expires one year after a union has been certified by the ALRB as bargaining representative. The employer sought declaratory relief in superior court. We granted a writ directing the superior court to dismiss the action. We found the *Leedom* v. *Kyne* exception inapplicable because there was neither a statutory violation by the Board nor any deprivation of a right guaranteed by the Act. (72 Cal.App.3d at p. 274.)

The First District did likewise in *Thomas S. Castle Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1983) 140 Cal.App.3d 668 [189 Cal.Rptr. 687], in which the superior court issued a writ of mandate compelling the ALRB to dismiss a certification petition, finding that the ALRB acted in excess of its designated powers by accepting and acting on the petition although it was not timely filed in the proper office. The appellate court reversed the judgment, stating that "[e]ven an erroneous assertion of authority is insufficient to invoke the *Leedom* v. *Kyne* exception . . . ." (140 Cal.App.3d at p. 675.) Because neither the timeliness nor location requirement is a jurisdictional prerequisite to the ordering of an election, the ALRB's acceptance of the petition was not subject to direct judicial review. (*Id.* at p. 676.)

Only one reported California case, *Yamada Brothers* v. *Agricultural Labor Relations Bd.* (1979) 99 Cal.App.3d 112 [159 Cal.Rptr. 905], has permitted superior court review under the *Leedom* v. *Kyne* exception. *Yamada* dealt with an ALRB order extending the union's certification, rather than an order of initial certification. The employer challenged the order on grounds including that the ALRB failed to make a statutorily required finding that the employer had not bargained in good faith. The superior court concluded it lacked subject matter jurisdiction and dismissed the employer's petition for writ of mandate. On appeal the Third Appellate District reversed, finding the case came within the *Leedom* v. *Kyne* exception. The court relied on section 1155.2, subdivision (b), which empowers the ALRB to extend a union's certification up to one additional year. The statute provides that when a timely petition for extension is filed, "the [ALRB] shall determine whether an employer has bargained in good faith" and, "[i]f the [ALRB] finds that the employer has not bargained in good faith, it may extend the certification . . . ." The Third District found this language "mandatory and clear," and the ALRB's failure to make the required finding rendered its administrative action "fatally defective." (99 Cal.App.3d at p. 123.) The court went on to reject the union's and the ALRB's contention that the employer had an available remedy for indirect review via an unfair labor practice proceeding. The court concluded that under existing statutory provisions and administrative regulations, orders and findings in extension cases, unlike those in initial certification matters, are not reviewable in unfair labor practice proceedings.

(*Id.* at pp. 123-124.) Earlier in its opinion the court noted that "a prerequisite to equitable relief outside the provisions of the [A]ct is the unavailability of an ultimate judicial remedy in conjunction with review of an unfair labor practice proceeding." (*Id.* at p. 121.) Thus, the superior court had jurisdiction under *Leedom* v. *Kyne.*

One other case merits discussion. In *Cadiz* v. *Agricultural Labor Relations Bd.* (1979) 92 Cal.App.3d 365 [155 Cal.Rptr. 213], this court relied on *Leedom* v. *Kyne* to exercise its original jurisdiction and issue a writ of mandate directing the ALRB to set aside its order nullifying and dismissing a petition for decertification. The petition was filed by an employee a few months into the term of a one-year collective bargaining agreement between the employer and the UFW. A decertification election was held, but before the ballots were counted, the ALRB impounded them and ultimately dismissed the petition as untimely. Both the petitioning employee and the employer sought writ relief directly in this court. The substantive legal issue raised by their petition involved language in section 1156.7, subdivision (c), stating that a petition for decertification "shall not be deemed timely unless it is filed during the year preceding the expiration of a collective-bargaining agreement which would otherwise bar the holding of an election, and when the number of agricultural employees is not less than 50 percent of the employer's peak agricultural employment for the current calendar year." We said: "This language on its face explicitly permits a decertification petition to be filed at any time during the term of a one-year contract and is too clear to permit any administrative or judicial tampering with its provisions." (92 Cal.App.3d at p. 371.)

Having concluded that the ALRB exceeded its authority by dismissing the decertification petition on the sole grounds of untimeliness, we considered whether immediate judicial review was warranted. We determined the legal remedy was patently inadequate because under the peculiar facts of the case the election results were unknown and could not be known until the ballots were counted. The employer could not fairly be expected to refuse to bargain, knowing that even if he prevailed on the timeliness issue he might still be guilty of an unfair labor practice if the decertification election failed. (*Cadiz* v. *Agricultural Labor Relations Bd.*, *supra*, 92 Cal.App.3d at p. 383.) Thus, mandamus issued.[5]

■ In summary, under both federal and California case law, application of the *Leedom* v. *Kyne* exception to the general rule against direct judicial

---

[5]In reaching this result, the court quoted from a then recently filed opinion of the United States Court of Appeals for the District of Columbia (*Physicians National House Staff Association* v. *Murphy* (D.C. Cir. Apr. 2, 1979) 85 Lab.Cas. (CCH) ¶11.205 [100 Lab.Rel.Ref.Manual (Bur.Nat.Affairs) p. 3055], and applied criteria articulated in that opinion. (*Cadiz* v. *Agricultural Labor Relations Bd.*, *supra*, 92 Cal.App.3d at p. 382.) After

review is dependent on three factors, all of which must be present. First, the challenged order must be " 'a "plain" violation of an unambiguous and mandatory' " statutory provision. (*Nishikawa Farms, Inc.* v. *Mahony, supra,* 66 Cal.App.3d at p. 788, quoting from *Boire* v. *Miami Herald Publishing Company* (5th Cir. 1965) 343 F.2d 17, 21.) Second, the order must deprive the complaining party of a right assured to it by the statute. (66 Cal.App.3d at p. 788; *United Farm Workers* v. *Superior Court, supra,* 72 Cal.App.3d at p. 274.) Third, indirect review of the order, through an unfair labor practice proceeding, must be unavailable or patently inadequate. (*Yamada Brothers* v. *Agricultural Labor Relations Bd., supra,* 99 Cal.App.3d at p. 121; *Cadiz* v. *Agricultural Labor Relations Bd., supra,* 92 Cal.App.3d at p. 383.)

3. *Application to instant case*

A. *There was no plain violation of an unambiguous and mandatory statute*

 Gallo argues, and respondent court found, that the ALRB clearly violated section 1156.4, which reads in its entirety:

"Recognizing that agriculture is a seasonal occupation for a majority of agricultural employees, and wishing to provide the fullest scope for employees' enjoyment of the rights included in this part, the board shall not consider a representation petition or a petition to decertify as timely filed unless the employer's payroll reflects 50 percent of the peak agricultural employment for such employer for the current calendar year for the payroll period immediately preceding the filing of the petition.

"In this connection, the peak agricultural employment for the prior season shall alone not be a basis for such determination, but rather *the board shall estimate peak employment on the basis of acreage and crop statistics which shall be applied uniformly throughout the State of California* and upon all other relevant data." (Italics added.)

Gallo's argument focuses on the italicized language. According to Gallo, the ALRB did not use crop and acreage statistics applied on a uniform statewide basis to determine Gallo's prospective 1994 peak work force, but, instead, based its certification on Gallo's unadjusted 1993 peak employment figures.

We cannot agree with Gallo that the statutory language in question is clear and unambiguous. Other than requiring the ALRB to look beyond the

our decision in *Cadiz* was filed, the cited opinion was vacated. (See *Physicians National House Staff Association* v. *Murphy* (D.C. Cir. June 5, 1979) 86 Lab. Cas. (CCH) ¶ 11,335 [104 Lab.Rel.Ref.Manual (Bur.Nat.Affairs) p. 2592].)

previous season's employment figures in determining prospective peak employment in the current year, the language raises more questions than it answers. What "acreage and crop statistics" should be considered? Who is to compile the statistics? Must the statistics themselves reflect statewide data, or is the ALRB only required to apply statistics from a smaller database uniformly on a statewide basis? What relative weight should be given to the statistics in light of the employer's prior year's figures and "all other relevant data?"

Over the Act's 20-year lifetime, the ALRB has grappled with the intended meaning of section 1156.4. It very early determined that it was required to take crop and acreage statistics into account only in prospective peak cases. (*Ranch No. 1, Inc.* (Feb. 23, 1976) 2 ALRB No. 37.) In 1978 the ALRB stated:

"We think it is incumbent on this Board, pursuant to the language of Labor Code Section 1156.4, to develop standards for estimating peak employment and determining the timeliness of petitions which reflect such factors as crop and acreage data applicable on a statewide basis. The purpose of this process is to establish standards which will enable employees and their prospective representatives to know with reasonable certainty when they may call for an election at a particular employer's operation.

"We cannot, however, deny employees access to the collective bargaining rights conferred upon them by the legislature, pending our accumulation of more information and experience with the varied and complex seasonal patterns of agricultural employment in California. . . ." (*Bonita Packing Co., Inc.* (Dec. 27, 1978) 4 ALRB No. 96, pp. 9-10; accord, *Tepusquet Vineyards* (June 20, 1984) 10 ALRB No. 29, pp. 7-8.)

The Board readdressed the issue when considering Gallo's contention in the present dispute. Referring to its previous statement, quoted above, the Board opined that "an examination of the context of this statement . . . reveals that it cannot be read to stand for the proposition that the Board must create such statistics or that they must be employed in every case." (*Gallo Vineyards, Inc., supra*, 21 ALRB No. 3, p. 17.) The Board characterized the statement as "merely reflect[ing] the Board's expectation that such statistics would eventually become available" and further noted that in *Bonita* and *Tepusquet* it approved of the methods utilized in those cases even though they were not based on crop and acreage statistics uniformly applied throughout the state. (21 ALRB No. 3, p. 17.) The Board also noted "that there is no reason to believe that the availability of uniform statistics would have affected the procedural history of any cases that have come before the Board." (*Gallo Vineyards, Inc., supra*, p. 17, fn. 14.)

The Board elaborated further, "While the Board stands ready to utilize such statistics in appropriate cases, experience thus far has not resulted in any useful methods of utilizing crop and acreage statistics on a uniform statewide basis. Nor has any party in this case brought any such statistics to our attention or explained how they might properly be utilized. Additionally, as far as we have been able to determine, in no adjudicatory or rulemaking proceeding before the Board have any interested parties brought to our attention any existing statistics or proposals for creating such statistics for purposes of estimating peak employment." (*Gallo Vineyards, Inc.*, *supra*, 21 ALRB No. 3, p. 18.)

The Board summarized it had neither discovered nor been made aware of any relevant method of utilizing uniform crop and acreage statistics, as such standards would be less reliable than information based on the history of an individual employer's operations. The Board noted the drastic divergence in California of growing seasons, harvest dates, varieties of crops, elevation, weather conditions and markets. The Board opined that such statistics would only be helpful as a basis of comparison in evaluating a grower's data that varied widely from the norm or where the grower had no past data to draw upon. It reiterated its intent to utilize such statistics in "appropriate" cases. (*Gallo Vineyards, Inc.*, *supra*, 21 ALRB No. 3, pp. 19-20.)[6]

The legislative history of section 1156.4 is minimal. At one point Assemblyman Warren stated he assumed peak agricultural employment would be computed by reference back to the preceding year. After a reading of the wording in section 1156.4, he stated, "So I take it by that there will be some standard that the Board will prepare not applicable to a particular employer, but to the industry generally which the Unions or the employee's [*sic*] seeking to organize can make some reference in determining whether or not a petition they have ready for filing can be timely filed." Assemblyman Berman, one of the co-authors of the bill, replied affirmatively to that comment. (See Hearings on Sen. Bill No. 1 (1975 Third Ex. Sess.) Before the Assem. Ways & Means Com. (May 27, 1975) p. 24.) Then Secretary of Agriculture Rose Bird testified that when an employer will be harvesting a

---

[6]The Board's chairman filed an opinion "concurring with reservations." (*Gallo Vineyards, Inc.*, *supra*, 21 ALRB No. 3, p. 29 et seq.) He referred to the Board's previous statements in *Bonita Packing Co., Inc.*, *supra*, 4 ALRB No. 96 and *Tepusquet Vineyards*, *supra*, 10 ALRB No. 29, as a commitment, but acknowledged that establishing a generalized system of statistics and standards exceeded the Board's expertise and was precluded by the current Board's budget limitations. He expressed the hope that through its rulemaking proceedings the Board would either commit "to pursuing uniform standards or make it clear that uniform standards will not be considered." (*Gallo Vineyards, Inc.*, *supra*, at p. 33.) Nevertheless, he concluded that the failure to adopt such standards did not constitute grounds for legal relief from Board certification orders. (*Id.* at pp. 33-34.)

crop for the first time "the Board can determine, from statistics and acreage, and crop statistics, what your peak probably would be." (*Id.* at pp. 28-29.)

Gallo has not pointed to any available statistics or data source which the Board failed to apply uniformly throughout the state. Thus, its contention is that the Board is mandated by statute to create the statistics. After initially ordering dismissal of Gallo's petition, on reconsideration respondent court agreed with Gallo. It relied heavily on the ALRB's statement quoted above from *Bonita Packing Co., Inc., supra,* 4 ALRB No. 96. Based on that statement, respondent court found that because the Board did not gather "the requisite statistics," it had "acted in defiance of" section 1156.4.

We disagree. As noted earlier, section 1156.4 refers to "acreage and crop statistics" but neither defines that term nor clearly states that the ALRB is to compile data from which the statistics may be derived. While the Board has acknowledged an obligation to develop standards for projecting peak based on crop and acreage data applicable on a statewide basis, we do not interpret its statement as an admission that its statutory duty is to collect data and create the statistics. In fact, the Board has consistently recognized that the data available to it is insufficient for developing uniform standards.

The ALRB is the agency entrusted with enforcement of the Act, and its interpretation should be given great respect by the courts and followed if not clearly erroneous. (*San Diego Nursery Co.* v. *Agricultural Labor Relations Bd.* (1979) 100 Cal.App.3d 128, 140 [160 Cal.Rptr. 822].) Similarly, the United States Supreme Court has held that " '[t]he Board's construction here, while it may not be required by the Act, is at least permissible under it . . . ,' and in these circumstances its position is entitled to deference. [Citations.]" (*NLRB* v. *Transportation Management Corp.* (1983) 462 U.S. 393, 402-403 [76 L.Ed.2d 667, 676, 103 S.Ct. 2469].) Given the vague language of section 1156.4, we cannot dismiss ALRB's interpretation as clearly erroneous.

We do not now need to decide the full extent of the ALRB's duty under section 1156.4, and we do not do so. We simply hold that because of the ambiguous statutory language, the Board's own interpretation, and Gallo's failure to present evidence of crop and acreage statistics which it claims the ALRB did not apply uniformly, there was no plain violation of an unambiguous mandatory statute justifying application of the *Leedom* v. *Kyne* exception.

B. *The ALRB did not deprive Gallo of a "right" assured by statute*

Even if the ALRB could be said to have violated section 1156.4, Gallo has not shown that it was thereby deprived of its statutory "right."

The opening sentence of section 1156.4 clearly states that the purpose of the 50 percent of peak employment requirement is "to provide the fullest scope for employees' enjoyment of the rights included in" the Act. Both the ALRB and the courts have recognized this purpose. (See, e.g., *Gallo Vineyards, Inc., supra,* 21 ALRB No. 3, p. 14; *Ruline Nursery Co. v. Agricultural Labor Relations Bd., supra,* 169 Cal.App.3d at p. 256.) While an employer obviously has an interest in the timing of an election, the procedural provisions of section 1156.4 cannot fairly be construed as conferring any "right" on the employer, at least not in the sense the Supreme Court used that term in *Leedom* v. *Kyne, supra,* 358 U.S. 184, 189 [3 L.Ed.2d 210, 214-215]. The statute involved in that case expressly protected professional employees from being included in a unit with nonprofessional employees, unless a majority of the professional employees voted for inclusion. The NLRB's inclusion of the professional employees in a bargaining unit with nonprofessional employees deprived the former of their statutorily granted right to vote. Nothing similar occurred here.

### C. *Gallo has an available remedy through indirect judicial review*

Finally, the *Leedom* v. *Kyne* exception is inapplicable here because Gallo's remedy of indirect judicial review through unfair labor practice proceedings is available to it and is not patently inadequate.

After certification, the UFW sought to open negotiations with Gallo. Gallo rejected the invitation, and the UFW then filed an unfair labor practices charge. This is the normal procedure pursued by an aggrieved party who wishes to challenge an order in certification proceedings. (See *J.R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d at pp. 10-11.) Instead of allowing the unfair labor practice matter to proceed, however, Gallo obtained a stay order from respondent court. Any delay in obtaining a final order reviewable under section 1160.8 is attributable to Gallo's own action.

Gallo argues that further resort to administrative remedies was futile because the ALRB was steadfast in its position. Whether that is true is irrelevant, though, given the Act's specific provision that jurisdiction for judicial review is limited to an ALRB final order and is exclusively in the Court of Appeal, not the superior court. (§ 1160.8.) Gallo is in no different position in this case than any other employer who claims that ALRB erred in reaching its certification decision.

### 4. *The Fay v. Douds Exception*

Gallo argues that this case falls within another exception to the rule against direct judicial review of certification orders. It cites *Fay* v. *Douds* (2d

Cir. 1949) 172 F.2d 720 as "establish[ing] a right to immediate review of NLRB decisions where the NLRB fails to afford due process." Gallo contends that it was denied due process by the ALRB in two respects; first, when the ALRB "shifted" to Gallo the burden of estimating its 1994 peak employment; and, second, by applying "an illegal, underground regulation" in violation of the APA.

Initially, we question whether *Fay* v. *Douds, supra,* is reliable authority for the position Gallo takes. The rule of the case has never been approved by the Supreme Court and it has been expressly questioned or criticized in other circuits. For example, in *Squillacote* v. *Int'l Broth. of Teamsters* (7th Cir. 1977) 561 F.2d 31, the court referred to later decisions which question the continuing vitality of *Fay* and noted that even the Second Circuit has limited its application. (561 F.2d at p. 37.) (See also *N.L.R.B.* v. *Interstate Dress Carriers, Inc.* (3d Cir. 1979) 610 F.2d 99, 107; *Blue Cross & Blue Shield of Michigan* v. *N.L.R.B.* (6th Cir. 1979) 609 F.2d 240, 244-245; *J.P. Stevens Emp.* v. *N.L.R.B.* (4th Cir. 1978) 582 F.2d 326, 329.)

While some California cases have cited *Fay* v. *Douds* in passing, no published decision has actually followed the case. (See, e.g., *Belridge Farms* v. *Agricultural Labor Relations Bd.* (1978) 21 Cal.3d 551, 556 [147 Cal.Rptr. 165, 580 P.2d 665]; *Nishikawa Farms, Inc.* v. *Mahony, supra,* 66 Cal.App.3d at p. 788; *Yamada Brothers* v. *Agricultural Labor Relations Bd., supra,* 99 Cal.App.3d at p. 121.)

In any event, Gallo has not made any substantial showing that the ALRB denied it due process.

Gallo relies on *Parker* v. *City of Fountain Valley* (1981) 127 Cal.App.3d 99, 116 [179 Cal.Rptr. 351], for its burden of proof contention. *Parker,* however, dealt with an administrative disciplinary hearing against a police officer, resulting in his termination. The court noted that it is axiomatic in such proceedings "that the burden of proving the charges rests upon the party making the charges." (127 Cal.App.3d at p. 113.) In the certification proceedings before the ALRB in this case, however, there were no "charges" but simply an investigation into the size of Gallo's prospective peak employment to determine whether the UFW's petition was timely. California Code of Regulations, title 8, section 20310, subdivision (a)(6) provides that if an employer contends the petition was filed at a time when the number of employees employed constituted less than 50 percent of its peak agricultural employment for the current calendar year, the employer shall provide evidence sufficient to support that contention. The employer's failure to provide this information gives rise to a presumption the petition is timely filed with

respect to the employer's peak season. (*Id.* at subd. (e)(1)(B); *Scheid Vineyards & Management Co.* v. *Agricultural Labor Relations Bd.* (1994) 22 Cal.App.4th 139, 145-146 [27 Cal.Rptr.2d 36].) Since it was Gallo who contended the petition was untimely, the burden of supporting that contention properly rested on Gallo.

Gallo's second due process claim, while somewhat more complex than the first, is equally devoid of merit. The claim centers on the ALRB's comparison of the total number of employees during the prepetition eligibility period (body count), with the average number employed during the 1993 peak period. Gallo argues that under its own regulations the ALRB was required to compare average employment numbers from both periods to determine whether the 50 percent of peak employment test was satisfied. It points to title 8 of the California Code of Regulations, section 20310, subdivision (a)(6)(B). According to Gallo, by following the method it did, the ALRB adopted an "underground regulation" without following the procedure specified in the APA. (See Gov. Code, § 11340.5, subd. (a).)

The regulation to which Gallo refers reads: "If the employer contends that he expects that a payroll period later in the calendar year will reflect an average number of employee days worked that is more than twice the average number of employee days worked during the payroll period immediately preceding the filing of the petition, he shall provide the Board with information to support this contention." (Cal. Code Regs., tit. 8, § 20310, subd. (a)(6)(B).)

On its face, the regulation does not "require" the ALRB to use any particular method of determining peak. Even if the regulation is construed as Gallo suggests, the ALRB was precluded from comparing average numbers for each payroll period because of the decision in *Adamek & Dessert, Inc.* v. *Agricultural Labor Relations Bd., supra*, 178 Cal.App.3d 970. In that case the ALRB did what Gallo claims it was required to do here, yet the court expressly found the method was contrary to the statutory language in section 1156.3, subdivision (a)(1). (178 Cal.App.3d at p. 978.) Under *Adamek*, the ALRB must use the body count method for determining the number of current employees. The court went on to say that "the statute does not say how the number employed during peak is to be determined" and approved a determination of timeliness based on comparison of the body count for the eligibility period with the average number employed during the peak period. (*Id.* at pp. 978-979.)

· After *Adamek*, the ALRB was not free to use average numbers from the eligibility period to determine that a certification petition was timely, no

matter what its regulation said. ██ ██ " 'Administrative regulations that violate acts of the Legislature are void and no protestations that they are merely an exercise of administrative discretion can sanctify them. They must conform to the legislative will if we are to preserve an orderly system of government.' " (*Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 419 [128 Cal.Rptr. 183, 546 P.2d 687].)

In *Triple E Produce Corp.*, *supra*, 16 ALRB No. 14, the Board followed *Adamek* and found that California Code of Regulations, title 8, section 20310, subdivision (a)(6)(B) "cannot stand." (16 ALRB No. 14, p. 6.) The *Triple E* decision was filed on October 10, 1990, and Gallo was then put on notice that the ALRB would not further rely on its published regulation. This circumstance distinguishes the case relied on by Gallo in which a due process deprivation was found because the taxing authority sought to deny an exemption based on a statutory interpretation of which the taxpayer had no notice and could not have reasonably foreseen. (*Pacific Southwest Airlines* v. *State Bd. of Equalization* (1977) 73 Cal.App.3d 32, 35-37 [140 Cal.Rptr. 543].)

## DISPOSITION

Let a peremptory writ of mandate issue directing respondent court (1) to vacate its order of March 4, 1996, in Stanislaus County Superior Court action No. 34790 granting Gallo's peremptory writ of mandate compelling the ALRB to reverse and vacate its July 24, 1995, certification decision, sustaining Gallo's election objections, dismissing the UFW's election petition, and vacating the certification of the UFW, and (2) to enter a new order dismissing Gallo's petition.

Those portions of the order filed on April 17, 1996, staying further proceedings in ALRB case No. 94-RC-5-Sal shall remain in effect only until the directions in this opinion have been complied with by respondent court, this opinion is final in all courts of this state or the Supreme Court grants a hearing herein, whichever shall first occur; thereafter said stay order is vacated and the stay is dissolved.

The ALRB shall recover its costs in this proceeding.

Stone (W. A.), Acting P. J., and Vartabedian, J., concurred.

A petition for a rehearing was denied September 20, 1996, and the petition of real parties in interest for review by the Supreme Court was denied November 20, 1996.